**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| SARA ENID VALENTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:16-cv-01071-NKL |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Plaintiff Sara Valentin appeals the Commissioner of Social Security's final decision denying her application for disability insurance benefits under Title II and Title XI of the Social Security Act. For the following reasons, the Court reverses and remands the decision of the ALJ.

**I.      Background**

Valentin was born in 1977, and alleges she became disabled following a fall while working at a nursing home in October 2009. Valentin alleges the onset date of her disability was six months later, 4/13/2010, when her injuries forced her to cease working completely. The Administrative Law Judge held a hearing on 3/25/2015 and denied Valentin's applications for disability insurance benefits and supplemental security income benefits on 6/9/2015. In this appeal, Valentin argues that the ALJ's RFC is unsupported by the substantial evidence of the record as a whole, contending the ALJ erred in failing to consider two third-party statements. Valentin also argues the ALJ committed reversible error in her evaluation of two expert opinions. Finally, Valentin argues the Commissioner failed to sustain her burden at Step Five of the sequential analysis, by relying on the Vocational Expert's testimony even though she only provided three jobs that are all incompatible with Valentin's RFC.

### A.    Medical History

On 10/27/2009, Valentin visited Gary N. Thomsen, M.D., complaining of back pain. Tr. 337. Valentin told Dr. Thomsen that she had injured her back the previous day at work. She was a Certified Nursing Assistant, and had slipped on a puddle of water while bathing a resident. Valentin told Dr. Thomsen that her pain was exacerbated by activity, walking, movement, manipulation, or straining, and rated her pain a ten out of ten. Tr. 337. Dr. Thomsen noted she was anxious and in mild distress. Tr. 338. He examined Valentin, and noted that she felt worse pain lowering her legs, had decreased lumbar ROM in all planes, and pain at L4-S1 laterally and into her hips. Tr. 338. X-rays were negative for acute osseous abnormality. Dr. Thomsen prescribed Flexeril and Tylenol, and restricted Valentin from lifting more than five pounds, prolonged standing or walking, and pushing or pulling more than ten pounds. She was restricted to limited use of her back and hips. Tr. 339.

Three days later, Valentin returned to see Dr. Thomsen because her symptoms were worsening. She had been scheduled for physical therapy, but did not comply due to severe pain. Tr. 340. She reported pain in the thoracic and lumbar region of her lower back. Tr. 340. Thomsen diagnosed a lumbar strain and spine pain, and prescribed Ibuprofen and Vicodin. Tr. 341. He placed the same physical restrictions on Valentin, and once again scheduled her for physical therapy. Tr. 341.

Valentin returned to see Dr. Thomsen on 11/4/2009, because her symptoms continued to get worse and the medication and physical therapy were not helping. Tr. 343. She reported pain in her lower back and left leg, which she rated a six out of ten. Tr. 343. She also experienced associated stiffness and numbness. Tr. 343. An MRI of the thoracic spine revealed mild disc desiccation throughout her thoracic spine, a small disc bulge at T6-T7 which effaced the anterior aspect of the thecal space, and minimal spurring of the vertebral endplates within the mid to

inferior aspect of the thoracic spine. Tr. 345. An MRI of the lumbar spine showed small central disc protrusion at L4-L5 which did not appear to abut the anterior aspect of the thecal sac or either nerve root. It also showed broad-based left lateral disc protrusion at L5-S1 which minimally encroached upon the left neural foramen and appeared to abut the left L5 nerve root along its inferior margin, mild facet arthrosis at L4-L5 and L5—S1, hemangioma within the vertebral body of L3, and disc desiccation throughout the thoracolumbar spine, most pronounced at L4-L5 and L5-S1. Tr. 347. Dr. Thomsen prescribed Vicodin, Ibuprofen, and Flexeril. Tr. 343.

The next day, Valentin returned to see Dr. Thomsen. Once again, she complained of severe back pain, stating that it radiated down her left leg and created some numbness and tingling in the left knee and foot. Tr. 349. Thomsen reviewed the MRIs from the previous day and diagnosed thoracolumbar disc disease, L5-S1 herniated disc on the left, and constipation. Tr. 349. Valentin was instructed to remain off work, and Epidural steroid injections were recommended. Tr. 349.

On 11/30/2009, Valentin was referred to Adrian P. Jackson, M.D., for surgical evaluation. Tr. 356. Valentin used a single prong cane to walk, reported the same lower back and left leg pain as before, but now also complained of neck and left arm pain. Tr. 356. Dr. Jackson acknowledged that this was not unusual, however, for time to pass with gradual development of symptoms. Tr. 356. Dr. Jackson noted it was a difficult exam due to intense pain, but he reported minimal objective findings. Tr. 356. The exam revealed diminished light touch sensation in the left L4 and S1 dermatones, in her left second and fifth digits, diminished cervical and lumbar range of motion, positive Hoffman's reflexes bilaterally, and negative straight leg tests. Tr. 356. Dr. Jackson opined that a structural abnormality in Valentin's lumbar spine, which existed before her injury, might have been aggravated. Tr. 357. He recommended more physical therapy, epidural steroid injections, and a cervical MRI. Tr. 357. That MRI revealed very mild

degenerative change with a mild loss of lordosis, but was essentially a normal scan. Tr. 361.

Valentin visited Joseph Galate, M.D., on 2/7/2010, at the request of her insurance company. Once again, Valentin described her slip and fall at work, and the resulting pain across her lower back, scapular area, and neck, with radiation down her left arm. Tr. 387. Her pain was constant and she had difficulty lifting anything heavy, standing, and walking. Tr. 387. Valentin also reported that she had some temporary paralysis, for which she was evaluated in the emergency room, but stated that she received medication and had had no further problems. Tr. 387. Valentin reported her pain as anywhere between six and ten out of ten, depending on whether it was a good day or a bad one, and stated she was able to sit for twenty-five minutes, stand for five minutes, and walk for up to two hours. Tr. 387-88.

Dr. Galate's exam revealed a limp in favor of her left leg, slow movement, and moaning during the interview. Her cervical ROM with flexion to forty degrees, extension to sixty degrees, and lateral bending to eighty degrees. The exam revealed negative Spurling's and axial load, flattening of normal lordotic curvature, lumbar ROM with flexion to sixty degrees, extension to twenty degrees, lateral bending to twenty degrees, and breakaway weakness with lower extremity testing. Tr. 389. Dr. Galate opined the slip and fall aggravated Valentin's lower back. He assessed irritation and tenderness over the left SI joint and short abductors on the left hand side. Tr. 391. Daypro, Soma, and Ultram were prescribed, and Dr. Galate recommended physical therapy for core stabilization. Tr. 391.

Valentin returned to see Dr. Galate on 3/10/2010, 4/1/2010, 4/22/2010, 5/11/2010, and 5/25/2010. Tr. 367, 371, 376, 379, 383. Each visit she complained of lower back pain, as well as pain in her neck and legs. Her pain often fluctuated, and she rated it anywhere between zero and nine out of ten. She stated she was unable to perform her duties at home, and that she had to quit working. Tr. 376. On each visit, Dr. Galate's exam showed a normal gait, spasms over the deep

paraspinal muscles, spasms in the multifidi bilaterally, normal ROM, normal sensation and muscle strength, and negative sitting straight leg raise. Lumbar disc bulge, lumbar degenerative disc disease, and degenerative lumbar spondylolisthesis were also diagnosed each time. Dr. Galate recommended more physical therapy, and scheduled a lumbar steroid injections for 3/16/2010 and 4/27/2010. Tr. 373.

On 8/11/2010, Truett L. Swaim, M.D., conducted an examination of Valentin. Tr. 1250. Valentin reported constant pain extending from her lumbosacral area down her left leg with weakness and numbness of the left leg. She stated that her pain increased while lifting, twisting, bending, stooping, prolonged standing, prolonged sitting, and prolonged walking. Valentin told Dr. Swaim that her pain was usually anywhere between an eight and ten out of ten. She was in constant discomfort, which caused associated headaches and weakness. Valentin stated her neck discomfort increased when she held it in one position, and whenever she lifted.

Valentin told Dr. Swaim that she had difficulty and pain with household chores, running, lifting, kneeling, pushing, or pulling. She scored a 37 on the Oswestry Function test. Dr. Swaim observed that before her slip and fall, Valentin had no history of any pre-existing occupational injury, previous neck or back conditions, or chronic headaches. Tr. 1254. Her current medications included Vicodin, Ultram, Soma, Excedrin, Tylenol, and Nexium. Tr. 1255.

Examination of the neck revealed tenderness in the paraspinous musculature, negative Spurling sign bilaterally, intact sensation and strength in both arms, and cervical ROM of flexion 52 degrees, extension 46 degrees, right lateral bending 40 degrees, left lateral bending 38 degrees, and bilateral rotation 60 degrees. Tr. 1255. Examination of Valentin's back revealed tenderness in the upper thoracic, lumbar paraspinous region, and both SI joints, negative Lasegue sign, negative bilateral straight leg raising, muscle spasm, guarding, and decreased bilateral patellar reflexes. Tr. 1256. Lumbar ROM of flexion was 38 degrees, extension 8 degrees, right

lateral bending 18 degrees, left lateral bending 14 degrees. Resisted strength testing in the legs revealed weakness of the left foot plantar flexion, though sensation was intact in both legs. Valentin could partially squat with difficulty, toe raise, and navigate steps with difficulty and use of handrail. Tr. 1256. Dr. Swaim diagnosed chronic lumbar pain with left leg radiculopathy due to disc protrusions in the lumbar region, and chronic cervicothoracic strain with associated headaches and radicular symptoms in the left arm. Tr. 1257.

Fernando Egea, M.D., examined Valentin on 11/1/2010. Valentin described her injury for him, and explained how it resulted in lower back pain that radiated to her buttocks and both lower extremities, with numbness and tingling in her foot. Tr. 420. Dr. Egea's exam found Valentin had a normal cervical ROM, no cervical tenderness, tenderness in the spinous processes of the lumbosacral spine, pain with palpation in the bilateral SI joints, tender supraspinous and interspinous ligaments, painful and spastic paraspinal muscles. Valentin's lumbar ROM was limited, positive left straight leg raising, normal gait, and normal sensory testing. Tr. 417-418.

A November 2010 EMG was abnormal and revealed lumbar radiculopathy involving the left S1 root. Tr. 416. On 1/17/2011, an MRI of the lumbar spine revealed minimal left posterolateral L5-S1 disc protrusion, which was less prominent than when previously seen in November 2009. Tr. 485.

On 1/11/2011, Valentin visited Kent Bogner, D.O., complaining of the same chronic lower back pain. Tr. 455. Dr. Bogner's exam revealed diffuse lumbosacral pain with radiation into the left buttock and back of the left leg. Tr. 455. He diagnosed lumbago low back pain, sciatica, and obesity. A Medrol Dosepak was prescribed. Tr. 456. Valentin returned to see Dr. Bogner on 1/20/2011, and he diagnosed chronic pain syndrome in addition to lumbago low back pain and sciatica, and Soma was prescribed. Tr. 453-454.

On 6/21/2011, Valentin visited Dr. Bogner again, this time complaining of anxiety and

depression. Tr. 443. She was diagnosed with depressive disorder not otherwise specified, and generalized anxiety disorder. She was prescribed Celexa and Klonopin, and switched from Ultram to Tylenol. The next day, Valentin was admitted to the hospital and examined by Vijay Parthiban, M.D. She reported a sudden onset of pain in her back, again radiating down her lower extremity. Tr. 428. Tenderness was noted over the dorsum of the left leg, mid-thoracic spine, and mid-lumbar spine. Straight leg raise was normal, and Valentin reported pain only when her legs lowered. Dr. Parthiban diagnosed back pain, chronic low back pain, congenital non-fusion of L5, and mild posterior L4-L5 disc bulging. Tr. 429. A CT scan of Valentin's head was normal. Tr. 431. A CT of her lumbar spine showed mild posterior L4-L5 disc bulging, degenerative changes L4-L5 and L5-S1 apophyseal joints, left L5 spondylolysis and congenital non-fusion L5 spinous process. Tr. 432. An MRI of the thoracic and lumbosacral spine showed small central posterior T6-T7 disc protrusion, mild left posterolateral L5-S1 disc protrusion extending to the left neural foramen. Tr. 433. MRI also revealed minimal posterior L4-L5 disc bulging, left L5 spondylolysis with hypertrophic bone formation, and deformity left L5 lamina related to congenital non-fusion of spinous process. Tr. 434. A CT of Valentin's cervical spine was normal. Tr. 435.

In July 2011, Valentin visited Thomas Laughlin, M.D., several times, and received three separate lumbar epidural steroid injections. On one occasion, Valentin also reported to the emergency room complaining of dizziness, headache, nausea, and weakness. Tr. 734. She was given IV fluid, and a CT scan of her head was normal. Tr. 733, 575. On 7/8/2011, Valentin visited Julie Broyle Wilwand, LPC, for counseling. She discussed her back injury with Ms. Wilwand, as well as the lingering pain. Valentin told Ms. Wilwand "this was the first time in her life she [had] been so sad." Tr. 512. Ms. Wilwand noted Valentin's current psychiatric symptoms included generalized anxiety, difficulty concentrating, cries easily, lethargy, tiredness, and loss of interest. Tr. 513. Her current medications were listed as Paxil, Klonopin, Percocet, Tylenol,

Flexeril, birth control, and Vitamin D. Tr. 514.

On 9/6/2011, Valentin again presented to the emergency room complaining of severe low back pain and numbness. Tr. 771. She was prescribed Ultram, Flexeril, and Motrin. Tr. 772-73. On 11/29/2011, Valentin returned to see Dr. Bogner, and reported she had strained her back while cleaning her house over the weekend. Tr. 620. Diffuse pain was noted in the lumbosacral region, and vicodin and Soma were prescribed. Tr. 621.

In February 2012, Valentin visited Dr. Bogner on two separate occasions, each time complaining of vomiting and dizziness. Tr. 617, 619. Valentin also reported tinnitus and hearing loss in her right ear. Tr. 617. However, an MRI of the brain was normal.

On 4/10/2012, Valentin visited Jerry Lampe, P.T., and Kristy Kurtz, CCC/A. Valentin reported a single episode of severe vertigo, however since that time loud sounds would provoke more vertigo, and caused nausea and vomiting. Tr. 1227. Dix-Hallpike procedures were performed four times, but did not provoke subjective dizziness or nystagumus. Valentin reported that she sensed sand moving within her right ear when she reclined. Tympanometry testing revealed no significant fluid in the middle ear. However, her reported symptoms were noted to be consistent with VOR dysfunction. Tr. 1227.

In May 2012, Valentin visited Steven C. Kosa, M.D. During the exam, Valentin reported ongoing lower back pain that radiated down her left leg, as well as leg weakness and numbness. Tr. 585. She also reported dizziness, vertigo, and headaches. Valentin stated her headaches would last between five and twelve hours, and she rated the pain anywhere from an eight to a ten out of ten. She also reported nausea, vomiting, photophobia, and right ear pain, as well as neck pain, which radiated into her left arm, and tinnitus in her right ear. Tr. 585. A mental status exam showed Valentin was alert and fully oriented, and she could provide a detailed and accurate history. Tr. 586. Her memory, recent and remote, was intact, and she was attentive with normal

concentration. Her language was normal without dysarthria. Tr. 586. Valentin's physical exam revealed antalgic gait favoring her left leg, weakness with hip flexion in the left leg, mild to moderate with left hip flexion, knee flexion, and foot dorsiflexion, markedly reduced reflexes in the right patella and moderately reduced on the left, decreased reflexes in the ankle and plantar regions, and decreased sensation to vibration and light touch in the left leg. Dr. Kosa's impressions were of lower back and left leg pain with paresthesias and weakness, and headaches, likely migrainous in nature. Tr. 586.

A week later, Dr. Kosa examined Valentin for vertigo. She claimed it lasted from three hours to all day, and was accompanied by nausea. Tr. 523. An ENG test was performed, which showed right ear peripheral labyrinthine dysfunction of indeterminate duration. Tr. 523. A few days later, Valentin underwent a lumbosacral myelogram. Tr. 570. A lumbar CT following the myelogram revealed left posterolateral L5-S1 disc protrusion narrowing left lateral recess and congenital anomaly of left L5 lamina and non-fusion of the L5 spinous process. Tr. 571. Valentin left the hospital after the myelogram, against the advice of medical staff. Tr. 849.

The next day, Valentin reported to the ED via ambulance, with chronic pain in her back and left leg, and numbness. Tr. 899. Valentin had not lied flat after her procedure for three hours, as was recommended. Tr. 889. Valentin was admitted to the hospital and examined by Dr. Parthiban. She told Dr. Parthiban that she had come to the ED because of chest pain, headache, and worsening leg pain. Tr. 900. Dr. Parthiban diagnosed chronic low back pain following myelogram, spina bifida occulta, L5-S1 disc disease, obesity, HTN, headache, and chest pain. Tr. 901. An MRI of Valentin's lumbar spine revealed chronic deformity of the lamina and spinous process of L5 and small left paracentral disc protrusion with minimal narrowing of the lateral recess. Tr. 963. An MRI of the thoracic spine showed tiny central posterior T5-T6 and T6-T7 disc protrusions. Tr. 564. MRI of the lumbar spine showed chronic deformity of the lamina and

spinous process of L5 and small left paracentral disc protrusion with minimal narrowing of the lateral recess. Tr. 566. When Valentin was discharged, her diagnoses included chest pain secondary to costochondritis, chronic low back pain, headache secondary to post-lumbar puncture related to the myelogram, HTN, obesity, and anxiety. Tr. 597. Her medications at the time were Vicodin, Neurontin, Tylenol, Soma, Tramadol, Meclizine, Zantac, and Cholecalciferol. Tr. 598.

Valentin returned to see Dr. Bogner for a follow up appointment after she was discharged from the hospital. She stated her back pain had slowly started to improve during her hospital stay, however, she continued to have some back pain in the right, lower lumbar region. Tr. 612. Dr. Bogner diagnosed chronic pain syndrome, low back pain, and anxiety. Tr. 613. Celexa was prescribed. Tr. 613.

In June 2012, Valentin visited Dr. Kosa again because she continued to have episodes of dizziness and vertigo. Tr. 581. Valentin still reported that loud noises caused vertigo and fullness in her right ear. Tr. 581. Dr. Kosa noted that Valentin had developed some slow cognitive processing, excessive somnolence, and trouble talking at times. Tr. 581. Valentin told Dr. Kosa that she had become forgetful at times, but thought it may have been caused by some of her medication. Tr. 581. Dr. Kosa's examination revealed a normal gait, moderately positive Romberg, and dizziness. Tr. 581. Diagnoses included chronic vertigo, and chronic lower back pain, Celexa was switched to Cymbalta, and Neurontin was decreased. Tr. 581. Valentin was also referred to St. Luke's ear institute. Tr. 582.

In September 2012, Valentin visited Dr. Bogner again. Valentin reported more low back pain with some sciatic symptoms into the left leg. Tr. 606. She also reported occasional numbness in her toes, but was able to walk without difficulty. Tr. 606. Valentin was using a scopamine patch to try to treat her dizziness and vertigo. Tr. 606. Diagnoses included low back

pain radiating to the left leg, vertigo, and obesity. Tr. 607.

Valentin visited Saint Luke's ENT specialists on 10/4/2012. Tr. 531. She told doctors she was suffering from vertigo, which had begun in March. It was episodic, with some fullness in her right ear. Tr. 531. Valentin was assessed with active Meniere's disease, and bullous myringitis. A low-salt diet and valium as needed for vertigo were recommended. Tr. 533.

In January 2013, Valentine returned to see Dr. Bogner. She reported neck pain over the past three months. Tr. 603. She described that it worsened with flexion when she turned her head, and even described an "electrical shock" at times going into her hands. Tr. 603. She also described minor headaches and numbness and tingling in her hands. An examination revealed diffuse cervical pain, point tenderness of the lower cervical spine, intact cervical ROM, normal strength and sensation in the arms and hands, and preserved grip strength. Tr. 603. Diagnoses were of cervical pain, cervical radiculopathy, and obesity. Tr. 604. In February 2013 a CT scan of Valentin's cervical spine revealed soft tissues within the spinal canal not well-visualized caudal to C4 and minimal anterior C5-C6 osteophytic spurring. Tr. 632.

In October 2013, Valentin visited Dennis Velez, M.D., complaining of tinnitus, some hearing loss, and fullness in her ears, as well as ongoing back and hip pain. Tr. 643. Valentin stated that her pain was worse when walking, bending, and lifting. Dr. Velez's exam found a normal gait and stance without any assistive device, negative Romberg's, normal motor strength and sensation in both the upper and lower extremities. Tr. 646. It also revealed decreased bilateral patellar and ankle reflexes, tenderness in the lumbosacral spine with disturbance of rhythm on extension, negative Tendelenburg's test, tenderness in the left hip, pain limited ROM in the left hip, difficulty walking on heels and toes, difficulty bending over and touching toes, and difficulty squatting and rising. Tr. 647-48. Dr. Velez diagnosed possible lumbar spondylosis, history of depression, and history of Meniere's disease, though well controlled on medications.

Tr. 648.

Dr. Kosa examined Valentin next on 8/5/2014. She reported an electric like pain in her neck and arms. Tr. 1233. Valentin stated she was having trouble opening jars and bottles due to weakness and paresthesis. Tr. 1233. She complained of chronic headaches, with associated photophobia, phonophobia, dizziness, and nausea. Tr. 1233. She also complained of lower back pain, and stated she had difficulty controlling her bladder. Valentin believed her symptoms had become worse over the past six months. Tr. 1233. Dr. Kosa assessed low back pain, neck pain, urinary incontinence, migraine, vertigo, and paresthesia of arm. Tr. 1234.

An MRI of Valentin's lumbar spine revealed mild degenerative changes in L4-L5 and L5-S1 discs and apophyseal joints. Tr. 1242. MRI of the cervical and thoracic spine showed minimal degenerative changes. Tr. 1236. MRI of the thoracic spine revealed minimal degenerative changes. Tr. 1237. Nerve conduction studies and an EMG of bilateral upper extremeties were normal. Tr. 1245.

On 11/11/2014, Jennifer Parreira, FNP, examined Valentin. Valentin reported pain in her shoulders, neck, abdomen, and lumbar spine, which she rated as a seven out of ten. Tr. 1230. She also stated Topamax was not helping her migrains, and Cymbalta was not helping her pain. Tr. 1230. Valentin's exam revealed her gait was antalgic, and some giveaway weakness was present. Diagnoses included chronic pain syndrome, low back pain, neck pain, migraine, and paresthesia of arm. Ms. Parreira prescribed Elavil, and Cymbalta was discontinued. Tr. 1231.

Valentin visited Kristen King-Spero, LCSW, three times in Spring 2015. She was having a hard time adjusting to being disabled and dealing with pain. She was sad and anxious. Tr. 1277. She reported grief over the loss of her very successful life, and admitted depression. Tr. 1275. Valentin was diagnosed with depression and anxiety, as well as PTSD. Tr. 1275, 1281, 1290.

In May 2015, Ms. Parreira examined Valentin. She reported neck tightness with an electric-like sensation. Tr. 1404. She stopped taking Topamax due to problems with word finding and forgetfulness. She still took Soma for muscle stiffness. Tr. 1404. Her gait was antalgic, with some giveaway weakness. Diagnoses included chronic pain syndrome, headache, muscle weakness, and paresthesias/numbness. Tr. 1405.

In June 2015, Valentin visited Dr. Bogner. She reported a lot of anxiety, and she was tearful and anxious during the visit. Tr. 1407. She was very nervous and had panic attacks, and her symptoms included racing heart shortness of breath, and crying. She reported decreased energy and motivation. Tr. 1407. Dr. Bogner diagnosed IBS, depression, and anxiety, and Bentyl and Klonopin were prescribed. Tr. 1408.

A. Expert opinions

Truett L. Swaim, M.D., opined that Valentin's occupational injury on 10/26/2009 caused or was the prevailing factor to cause her to develop disc protrusions of the lumbar spine, resulting in chronic lumbar pain and left leg radiculopathy. Tr. 1257-58. Dr. Swaim also opined that the occupational injury caused or was the prevailing factor to cause the necessity for evaluation and treatment of Valentin's lumbar condition since her injury occurred. Dr. Swaim opined the occupational injury caused or was the prevailing factor that caused Valentin to develop chronic cervicothoracic strain with associated headaches and radicular symptoms involving her left arm. Tr. 1258. Dr. Swaim's prognosis was that Valentin would have ongoing lumbar pain with left leg radiculopathy and cervical discomfort with left arm radicular symptoms. Tr. 1258. He opined that Valentin had most likely reached her maximum medical improvement from treatment of her occupational injury. Dr. Swaim did not, however, believe her injury necessitated surgery.

Dr. Swaim assigned Valentin a 22.5% permanent partial disability of the body as a

whole, due to the lumbar condition, and a 12.5% permanent partial disability of the body as a whole due to the cervicothoracic strain with left arm radicular symptoms and associated headaches. Tr. 1258. Dr. Swaim placed work restrictions on Valentin, including light to medium work level with the ability to exert twenty to forty pounds of force occasionally, ten to twenty pounds of force frequently, and up to ten pounds of force on a constant basis. Tr. 1258. Dr. Swaim opined Valentin should avoid repetitive bending, stooping, twisting, squatting, climbing, kneeling or crawling. He stated Valentin should avoid lifting from below calf level, prolonged sitting, standing, or walking, repetitive or prolonged forceful use of the upper extremities above shoulder height, or jarring equipment and tools. Tr. 1258-59. The ALJ gave this opinion significant weight. Tr. 42.

Fernando M. Egea, M.D., composed a letter on 11/1/2010, in which he opined that in spite of medication, PT, and spinal blocks, Valentin's condition had not appreciably improved. Tr. 412. As a result, Valentin was unable to work. Dr. Egea also stated that Valentin lacked the funds for additional medical treatments, but would benefit from physical therapy, in particular swimming. Tr. 412. The ALJ treated this as a temporary opinion, and gave it little weight. Tr. 42.

Craig S. Lofgreen, M.D., wrote a letter on 2/28/2013, which stated Valentin had widespread pain, and reported disc herniation, radiculopathy, arthritis, and muscle spasm. Tr. 1261. He stated she had previously been diagnosed with Meniere's disease, anxiety, and depression. Tr. 1261. Dr. Lofgreen opined that Valentin's evaluation was challenging, but objectively normal for clinically significant radiculopathy. Dr. Lofgreen opined that this, in conjunction with her very prominent effective symptoms, would result in intolerance of her presence in the workplace. His primary basis, however, for that conclusion was her very pronounced-appearing affective disorder. Tr. 1261. The ALJ gave Dr. Lofgreen's opinion little weight.

J. Edd Bucklaw, PhD, a State agency psychological consultant, opined that Valentin's mental impairments should result in no limitations. The ALJ gave this opinion some weight.

Michael Dreiling, a vocational expert, issued an opinion on 3/5/2014. Tr. 313. Mr. Dreiling opined that "given the current level of functioning for [Valentin], including problems with prolonged sitting or standing and ongoing use of medications for her pain and discomfort, she would not be capable of performing substantial, gainful employment in the open labor market." Tr. 322. He also opined that Valentin would not be a realistic candidate for further formal training or education, due to her grasp of the English language. Tr. 322. Mr. Dreiling opined that Valentin is "essentially and realistically unemployable." Tr. 322. The ALJ gave this opinion little weight.

**B.      The hearing before the ALJ**

Valentin testified that she was thirty-nine years old, and had completed high school, with some University experience at the University of Puerto Rico. Tr. 58. Valentin stated that she had not worked since her alleged onset date, April 13, 2010. Tr. 68-69. She testified that before her injury in October 2009 she worked as a CNA. Tr. 59-60. She stated that on October 29, 2009, she was bathing a resident when the bathtub leaked and formed a puddle on the floor. Valentin stated that she slipped on the puddle. Tr. 63.

Valentin testified that since her initial injury she no longer has any strength in her waist, and that her legs "don't work." Tr. 64. Valentin testified that she has pain in her lower back, left leg, left hand, the left part of her neck, and her hips. Tr. 71. She stated she can no longer do things like vacuum, and she cannot bend over, kneel, or climb stairs without using the railing. Tr. 70-71. Valentin also testified that since her injury she had gained over 100 pounds. Tr. 71. She stated that there is no medication that completely takes away the pain, and she always maintains an "eight" out of ten. Tr. 71. Valentin also testified that she has Meniere's disease,

which causes vertigo, and chronic headaches. Tr. 72-73. Finally, Valentin testified that she had trouble controlling her bowels. Tr. 75.

Alissa Smith testified, by phone, as a vocational expert at the hearing. Tr. 76. The ALJ posed to her three hypothetical questions, which assumed an individual of Valentin's age, education, and past work experience. The first involved an individual who is able to sit for six out of eight hours, and she can stand and walk in combination for two out of eight hours. The individual should have the capability of shifting from time to time. The individual is able to lift, carry, push or pull negligible weight such as files or documents weighing up to five pounds frequently, and up to and including ten pounds occasionally. The individual should never push or pull with her bilateral lower extremities. The individual should never climb ladders, ropes or scaffolding, kneel, crouch or crawl. The individual can occasionally climb stairs or ramps and stoop, but not on a repetitive basis. The person should never be exposed to extreme cold, vibration, or hazards, which would include dangerous machinery and unprotected heights. Finally, the individual should have duties in which the training can be orally communicated. Essentially, the ALJ contemplated on-the-job training with no special classes of instruction that would involve reading or a lot of writing or speaking. Tr. 79. The VE testified that such an individual could perform the sedentary positions of toy stuffer, pharmaceutical processor, and printed circuit board screener. Tr. 80. All three jobs are SVP 2. Tr. 80.

Next, the ALJ posed another hypothetical with the exact same limitations as the first, but with the additional limitation that the individual should never have duties in which she would be expected to understand, remember, or carry out detailed instructions. Job duties must be simple, repetitive and routine in nature, and she should never be expected to exercise independent judgment regarding the nature of her duties. Tr. 81. The VE testified that the previously cited jobs would all remain available.

Finally, the ALJ posed a third hypothetical with the exact same physical limitations, and with or without the mental limitations. This time, the ALJ added that the individual would miss two to three days of work each month due to impairments. The VE testified that there would be no jobs in the region or nation for that person. Tr. 81.

The ALJ specifically asked the VE whether her testimony was consistent with the Dictionary of Occupational Titles. The VE testified that it was, however, she also stated for the record that she had used her professional opinion regarding "the alternating of positions, oral instruction versus written instruction, and then also the last hypothetical with absenteeism, [because] the DOT does not address those types of issues." Tr. 82.

## C. The Decision

The ALJ determined Valentin suffered the following severe impairments: degenerative disc disease of the lumbar and cervical spine, morbid obesity, and history of Meniere's disease. The ALJ found that Valentin has the residual functional capacity:

> [T]o perform less than a full range of sedentary work as defined in 20 CFR §§ 404.1567(a) and 416.967(a). Specifically, claimant is able to sit for 6 hours out of 8 hours; and she can stand and walk in combination for 2 hours out of 8 hours and should have the capability of shifting positions. Claimant is able to lift, carry, push, or pull negligible weights. Such as fuiles or documents weighing up to 5 pounds frequently and up to and including 10 pounds occasionally. Claimant should never push or pull with her bilateral lower extremities. She should never climb ladders, ropes, of (sic) scaffolding; kneel; crouch; or crawl. Claimant can occasionally climb stairs or ramps and stoop but not on a repetitive basis. Claimant should never be exposed to extreme cold; to vibration; or hazards, such as dangerous machinery and unprotected heights. Claimant's job duties must be learned via oral communication or on-the-job training.

> Mentally, claimant should never be expected to understand, remember, or carry out detailed instructions. Job duties must be simple, repetitive, and routine in nature. Claimant should never be expected to exercise independent judgment regarding the nature of her job duties.

Tr. 31. Relying on vocational expert testimony, the ALJ concluded Valentin's impairments would not preclude her from performing work that exists in significant numbers in the national

economy. Tr. 44-45.

## II. Discussion

Valentin argues that the ALJ's RFC is unsupported by substantial evidence on the record as a whole, because the ALJ disregarded two third party statements and improperly evaluated the opinion evidence. Valentin also argues that the Commissioner failed to sustain her burden at Step Five. She contends that the ALJ, relying on the vocational expert's testimony, erroneously concluded Valentin could perform three jobs for which the DOT conflicts with Valentin's RFC.

The Court's review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015). Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Id.* The Court must consider evidence that both supports and detracts from the Commissioner's decision but cannot reverse the decision because substantial evidence also exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015). If the Court finds that the evidence supports two inconsistent positions and one of those positions represents the Commissioner's findings, then the Commissioner's decision must be affirmed. *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015).

### A. Support for the RFC

Valentin argues that the RFC is unsupported by the substantial evidence of the record as a whole. She argues that the ALJ erred in failing to consider the third party statement of a SSA employee, Arellano, and by discounting the statements of Valentin's friend, Ms. Guevara, only because other medical and non-medical evidence outweighed it. Valentin also argues the ALJ committed reversible error in her evaluation of the opinions from Mr. Dreiling and Dr. Swaim.

Residual functional capacity is what a claimant can still do despite physical or mental limitations. 20 C.F.R. § 404.1545(a); *Masters v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); Social Security Ruling 96-8p, 1996 WL 374184, *5 (July 2, 1996). An ALJ must formulate the RFC based on all of the relevant, credible evidence of record. *See Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.") (*quoting Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)). The RFC determination must be supported by substantial evidence, including at least some medical evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000). Evidence relevant to the RFC determination includes medical records, observations of treating physicians and others, and a claimant's own description of her limitations. *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (citation omitted). The claimant has the burden to prove his or her RFC. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).

### 1.      Third Party Statements

The ALJ did not err by failing to acknowledge the third-party statement from an SSA employee, Arellano, or by discounting Ms. Guevara's statement. An ALJ is required to consider third party information and observations when evaluating a claimant's subjective complaints. *See Herbert v. Heckler*, 783 F.2d 128, 131 (8th Cir. 1986) (finding the ALJ "failed to give full consideration to all of the evidence presented relating to Herbert's subjective complaints," specifically referencing "evidence in the record concerning observations by third parties and treating and examining physicians"). The SSA regulations themselves point to the value of third party testimony, including SSA employees, in evaluating credibility and symptoms and in calculating the RFC. 20 C.F.R. § 416.913(d). However, "[a]lthough required to develop the record fully and fairly, the ALJ is not required to discuss every piece of evidence submitted."

*Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (quoting "*Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998). Moreover, "an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.*

Arellano completed a three-page questionnaire in connection with Valentin's initial application for benefits. The questionnaire consisted mostly of yes or no answers, and included the following statement: "Spoke Spanish thru phone interpreter. Had trouble hearing sometimes. Used a cane." Tr. 243. The ALJ spent twelve single-spaced pages of her decision discussing Valentin's RFC, including references to evidence located in the same section as Arellano's questionnaire. Tr. 31-43. The ALJ also specifically stated that she considered "all evidence of record, including . . . forms completed at the request of the Social Security Administration . . . and other relevant evidence . . . ." Tr. 42. It is therefore highly unlikely that she did not consider Arellano's brief statement. Tr. 243. Furthermore, the statement consists only of information that is found in countless other locations throughout the record. Several medical records note that Valentin used a cane, she visited ear specialists and complained of trouble hearing on several occasions, and her difficulty speaking and understanding English is well documented. Therefore, as the statement is brief and cumulative, if any error exists, it is harmless.

With regard to the statement of Ms. Guevara, Valentin argues the ALJ considered it, but improperly rejected it solely because it was outweighed by medical evidence. In September 2013, Ms. Guevara completed a third party function report. (Tr. 260-67). The ALJ stated that she considered this report in accordance with SSR 06-03p, but found "the allegations and testimony are outweighed by other medical and non-medical evidence." Tr. 43.

Social Security policy separates opinion evidence into two categories: medical sources, and non-medical sources. *See generally* SSR 06-03p. It also specifically contemplates opinions provided by non-medical sources that have seen the claimant in their personal capacity, such as

friends. *Id.* "In considering evidence from 'non-medical sources' who have not seen the individual in a professional capacity in connection with their impairments, such as . . . friends, . . . it would be appropriate to consider such factors as the nature and extent of their relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence. *Id.* "Other evidence" includes objective medical evidence. *See id.* (stating that "evidence includes, but is not limited to, objective medical evidence . . .."). Thus, the ALJ did not err in giving Ms. Guevara's testimony little weight because it was outweighed by objective medical evidence.

### 2.    Mr. Dreiling

Valentin argues that the ALJ committed reversible error when she afforded Mr. Dreiling's opinion little weight. Mr. Dreiling, a vocational expert, issued an opinion in March 2014 to determine the impact of Valentin's injuries on her ability to return to work. Tr. 313-23. Relying on Valentin's subjective complaints, Dr. Swaim's opinion, and a Wonderlic test, Mr. Dreiling ultimately opined that Valentin "is essentially and realistically unemployable." Tr. 43. The ALJ found that because Mr. Dreiling is not a medical source, and his opinion appeared to be based largely on Valentin's subjective complaints, the opinion warranted little weight. Tr. 43.

Mr. Dreiling is indeed not a "medical" source, but he is an "other" source. *See* SSR 06-03p. In evaluating "other" sources' opinions, the Social Security rulings provide that ALJ's should consider "the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion." *Id.*

Here, the ALJ gave Mr. Dreiling's opinion little weight because he is not a medical source, and because it was based largely on Valentin's subjective complaints, which are

unsupported by objective medical evidence and clinical findings. Tr. 43. That Mr. Dreiling is not a medical source goes toward his "area of expertise." That he based his opinion largely on unsupported subjective evidence goes toward "whether the opinion is consistent with other evidence," and the degree to which he presented "relevant evidence" to support his opinion. Furthermore, the opinion that Valentin "is essentially and realistically unemployable" is an issue left exclusively to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d) and 416.927(d).

Therefore, the ALJ did not err in giving Mr. Dreiling's opinion little weight.

### 3.     Dr. Swaim

Valentin argues the ALJ erred when she gave Dr. Swaim's opinion "significant weight," but then failed to include some of the limitations imposed by Dr. Swaim in the RFC.

While an ALJ is not required to base her RFC entirely on the opinion of one medical source, the ALJ must explain why a medical opinion was not adopted if it conflicts with the RFC. SSR 96-8p. Having afforded Dr. Swaim's opinion alone "significant weight," the ALJ offers no explanation as to why only certain limitations are incorporated in the RFC while others are not. For example, Dr. Swaim precluded Valentin from prolonged sitting, Tr. 35, yet the RFC permits sitting for up to six hours. Tr. 31. Dr. Swaim opined Valentin should be precluded from repetitive bending and twisting, as well as lifting below calf level and repetitive use of the upper extremities above shoulder height. Tr. 35. These restrictions are absent from the RFC. Tr. 31. The RFC is also more restrictive than Dr. Swaim's opinion with respect to Valentin's ability to lift and/or carry. Dr. Swaim opined Valentin should restrict occupational stresses to a light to medium work level, but the ALJ found Valentin should be reduced to sedentary work. However, the ALJ explained this inconsistency, stating it was due to objective evidence elsewhere in the record. Tr. 42. The ALJ did not explain her decisions with regard to the other inconsistencies.

While the ALJ could have relied on other evidence, she failed to explain why parts of the

RFC are inconsistent with Dr. Swaim's opinion, which she gave "significant weight." This is reversible error. *See Crews-Cline v. Colvin*, No. 4:13-CV-00723-NKL, 2014 WL 2828894 (W.D. Mo. June 23, 2014) (finding that when an ALJ states the RFC is based on one doctor's opinion, which was given "great weight," but then fails to explain why parts of the RFC are inconsistent with that opinion constitutes reversible error). On remand, the ALJ should either formulate an RFC consistent with Dr. Swaim's entire opinion, or explain why certain parts of the RFC are inconsistent, and how it is otherwise supported by substantial evidence in the record.

## B.     Finding at Step 5

Valentin also argues that the Commissioner failed to sustain her burden at Step Five of the sequential analysis. Valentin contends that because the ALJ specifically precluded her from understanding, remembering, and carrying out detailed instructions, she cannot perform any of the jobs identified by the VE.

If there is a conflict between the VE's testimony and the DOT, the ALJ must provide an explanation for the conflict before she can rely on the VE's testimony to determine the claimant is not disabled. SSR 00-4p.  Further, the ALJ must explain in her decision how the conflict was resolved. *Id.* If there is an "unrecognized, unresolved, and unexplained conflict between the VE's testimony and the DOT, the VE's testimony cannot provide substantial evidence to support the ALJ's disability determination and reversal is necessary." *McPheeters v. Astrue*, No. 4:12-0137-DGK-SSA, 2013 WL 523674, at *2 (W.D. Mo. Feb. 12, 2013) (quoting *Closson v. Astrue*, No. 06-4095-MHB, 2008 WL 504013, at *10 (N.D. Iowa Feb. 21, 2008)); *see also Bray v. Colvin*, 12-01257-CV-W-DGK-SSA, 2013 WL 6510743 (W.D. Mo. Dec. 12, 2013).

Here, the ALJ specifically precluded Valentin from understanding, remembering, and carrying out *detailed* instructions. Tr. 31. As such, the ALJ posed a hypothetical to the VE specifically including such a mental limitation. Tr. 81. The VE testified that an individual who

"should never have duties in which she would be expected to understand, remember or carry out *detailed* instructions," would be able to perform the jobs of "toy stuffer," "printed circuit board screener," and "pharmaceutical processor." Tr. 80-81. Thereafter, the ALJ relied on the VE's testimony and found Valentin could perform work that exists in the national economy. Tr. 45. However, each job identified by the VE has a DOT reasoning level of two, which requires the ability to "apply commonsense understanding to carry out *detailed* but uninvolved written or oral instructions." *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010). Thus, there is a conflict between the testimony provided by the VE and the DOT, and the ALJ did not recognize, resolve, or explain it.

The Commissioner argues that DOT job descriptions are generic, and offer the approximate maximum requirements for each position. Within each category, the Commissioner argues there is a spectrum of jobs that can be performed at a lower level. Further, the Commissioner relies on *Renfrow v. Astrue* for the proposition that a claimant limited to unskilled work can perform jobs with a reasoning level of three. 496 F.3d 918 (8th Cir. 2007). However, *Renfrow* is distinguishable. In *Renfrow*, the ALJ found the claimant could not do complex technical work, but rather was limited to only unskilled work. *Id.* at 920. The jobs identified in *Renfrow* each had a reasoning level of three, yet they were also classified as "unskilled." *Id.* at 921. Therefore the Eighth Circuit found the claimant was capable of performing them.

In the present case, the ALJ specifically restricted Valentin from performing detailed work, but then held that Valentin could perform three jobs, which by definition require the ability to carry out detailed instructions. These are contradictory findings that require an explanation. *See Jones v. Barnhart*, 315 F.3d 974, 979 (8th Cir. 2003) (noting "an ALJ cannot rely on expert testimony that conflicts with job classifications in the DOT unless there is evidence in the record to rebut those classifications"). Accordingly, the Court orders remand.

**III.     Conclusion**

For the reasons discussed above, the Court REMANDS this case to the Commissioner for further proceedings consistent with this opinion.

s/ Nanette K. Laughrey

NANETTE K. LAUGHREY
United States District Judge

Dated:  October  10, 2017
Jefferson City, Missouri